# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

---

(No. 12579.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROCCO LEMORTE, Plaintiff in Error.

*Opinion filed June 18, 1919—Rehearing denied October 9, 1919.*

1. CRIMINAL LAW—*court is justified in reprimanding counsel who makes many frivolous objections.* The court, in a criminal case, is justified in speaking sharply to the defendant's counsel who continually makes frivolous objections, and its action in so doing and in overruling such objections is not ground for reversal as showing prejudice of the court against the defendant.

2. SAME—*jury may be instructed to use their best judgment as reasonable men in weighing evidence.* It is proper to instruct the jury that they have no right to disbelieve as jurors if from the evidence they believe as men, and they may be instructed to take into consideration, in weighing the evidence, their "own common knowledge and observation in the affairs of life."

3. SAME—*instruction should not be worded to encourage jury to disagree.* An instruction stating, in substance, that no juror should consent to a verdict which does not meet with the approval of his conscience, after due deliberation with his fellow jurors and fully considering the evidence and the instructions, tends to encourage a disagreement of the jury and is properly refused.

4. SAME—*judgment of conviction cannot be reversed because counsel for defendant failed to exercise skill.* A court of review

cannot reverse a judgment of conviction in a criminal case because the counsel for the accused made a serious blunder at the trial or failed to exercise the greatest skill.

5. SAME—*counsel should state facts showing necessity for continuance of hearing of motion for new trial.* Where for any good reason the accused is justified in changing his counsel after the verdict the new counsel should be given time in which to prepare matters to be presented on motion for new trial, but in asking for a continuance of the hearing of the motion, facts should be stated showing necessity for delay and that the interests of justice require a continuance.

6. SAME—*court exercises discretion in delaying hearing of motion for new trial.* Whether new counsel for the accused shall be granted a continuance in which to prepare matters to be presented on motion for a new trial rests in the discretion of the trial judge, and unless there is a clear abuse of discretion tending to an improper conviction, a denial of the motion for continuance is not ground for a reversal of the judgment.

7. SAME—*newly discovered evidence must be conclusive to justify new trial.* Applications for new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and to justify the granting of a new trial the newly discovered evidence must be conclusive and not merely cumulative, nor of such a nature that its truth may be conceded without justifying an acquittal in the face of other evidence.

8. SAME—*courts are not required to rely on affidavits on motion for new trial.* Courts are not required to believe an unreasonable story, even though it is not contradicted, merely because it has been sworn to by a witness on the trial of the case, and they are not required to rely on or to believe *ex parte* affidavits on a motion for new trial.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. KICKHAM SCANLAN, Judge, presiding.

DESTEFANO & MIRABELLA, (CHARLES HUGHES, and Rocco DESTEFANO, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and HAYDEN N. BELL, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error was indicted at the December term, 1917, of the criminal court of Cook county for the murder of Martin Pina. At his trial before a jury in February, 1918, he was found guilty and his punishment was fixed at imprisonment in the penitentiary for fifteen years and judgment was entered on that verdict. This writ of error has been sued out to review those proceedings.

In July, 1917, John Rosol kept a saloon on State street, in Blue Island, in Cook county, and in connection with it he ran a dance hall and pool room. The saloon and dance hall were located on the first floor in a two-story building, the pool room being between them. The second floor of the building was occupied by Rosol and his family as a residence. On Saturday evening, July 14, 1917, in the street in front of this saloon, Martin Pina, a Mexican, was shot and killed. The evidence tends to show that dances had been conducted in this hall on several previous Saturdays; that they were carried on from early in the evening until midnight, and such a dance was being conducted on the evening of July 14; that between fifty and seventy-five persons, mostly Mexicans and Italians, were in the saloon, pool room and dance hall that night. The evidence tends to show that the saloon was closed a few minutes before twelve o'clock. Shortly after it was closed five revolver shots were fired in quick succession, after which Pina was found lying dead on the sidewalk in front of the saloon. Marie Kujowski was employed as a housemaid by Rosol, the proprietor. She had been keeping company with Stanley Groszwicz and he was visiting her that evening. She testified that she saw the plaintiff in error dancing in the hall during the Saturday evening of July 14; that she was quite well acquainted with him and had seen him at various times during the last few months; that his aunt lived next door; that she saw him come into the saloon from the dance hall just a few minutes before the saloon

closed, in company with another Italian, Gugliemucci; that after the saloon closed she and Groszwicz started to go up-stairs, when they heard a bottle crash on the sidewalk. They hurried to the front window up-stairs and she saw a crowd of Mexicans in one group and a crowd of Italians in another in front of the saloon; that plaintiff in error was with the Italians and stood three or four feet in front of them; that she became frightened and turned her eyes away and then heard the shots fired; that when she looked back she saw Pina lying on the sidewalk and two Mexicans standing by him and the Italians running away through the yard; that when she first saw the Mexicans and Italians they were about fifteen feet apart, about a dozen men in each group.

Stanley Groszwicz testified that he reached the saloon that night about seven o'clock and remained there and in the dance hall until it closed; that he was well acquainted with plaintiff in error and had known him for three years; that he saw him that evening first at about 7:30 o'clock in the saloon; that he also saw him in the saloon before it closed; that there were twelve or fourteen Italians with him. His story agreed substantially with the testimony of the maid, Marie. He testified to hearing the bottle smash when they were on their way up-stairs, and that when they reached the window and looked out he saw the group of Italians and group of Mexicans walking toward each other. He also testified that he saw plaintiff in error in front of the Italians with a revolver in his hand; that he saw him when he fired the five shots toward the Mexicans, and that Pina immediately fell to the sidewalk and the Italians ran away; that he and Marie ran down-stairs and got some water and went out to the man lying on the sidewalk; that he wrote the name of plaintiff in error, Rocco LeMorte, on paper and gave it to the police two weeks after the shooting; that he did not give the information sooner because he was afraid of the Italians. He testified positively that

the man who fired the shots was plaintiff in error, and that at the time of the shooting he was farthest in front of the group of Italians and nearest the Mexicans. It appears that after this witness had testified at the inquest he was talked to by some of the Italian friends of plaintiff in error, and one of them, a witness in this case, Mike LeMorte, said to him, in effect, as did others, "Try your best to get Rocco out of this trouble; he is a good fellow;" that in fear of his life he told some of them that he had not testified to the truth at the preliminary hearing; that shortly after they talked to him he met a crowd of Italians whose appearance aroused his fears, and he called up the police and a patrol wagon was sent to take him home.

Charles Schwartz was a special police officer detailed for the dance hall on the evening in question and was there during the evening and at the time of the shooting. He testified that there were two arc lights in the street near the saloon on the night in question which lit up the space quite clearly, and that a person looking through the window of Rosol's residence, as Marie and Groszwicz testified they looked, could plainly see the surroundings in front of the saloon and the people near by.

Two Italian girls, fifteen or sixteen years of age, who lived near the saloon in question, testified they were well acquainted with the plaintiff in error; that they were at the dance hall that evening and did not see him there at any time during the evening, although they had seen him there at other times and had danced with him. Several other witnesses testified that they were at the dance hall during the evening and did not see plaintiff in error there.

There was testimony on behalf of plaintiff in error by Tony Capiello, Joe Capiello, Anna Capiello and Mike LeMorte that on the night of the shooting plaintiff in error stayed all night at Tony Capiello's house, located some three miles distant from the saloon. Plaintiff in error had recently married. The Capiellos swore that he was there

during the entire evening of Saturday, July 14, and some of them testified that he and his wife remained there all night and were there the next forenoon. It appears from the evidence that plaintiff in error and his wife had never stayed with the Capiellos at any other time, and it is argued by counsel for the State that their story is unreasonable in thinking that the wife on such short acquaintance,—since July 4 of that year,—would visit the Capiellos and remain all night. Counsel for the State also question the story of some of these witnesses that they remembered the time when plaintiff in error's wife was there, because one of them, at least, talked about it a day or two after the shooting with a friend of plaintiff in error and his lawyer. They argue that this is unreasonable, because there had been no public charges made against plaintiff in error as to the shooting until some time thereafter, and that nobody was charging him with being in any way connected with the shooting until after Groszwicz, at least two weeks after the shooting, gave his name to the police. Counsel for plaintiff in error, on the other hand, argue that the story of Marie and Groszwicz, whose testimony was practically the only evidence in the record that connected plaintiff in error directly with the shooting, is unreliable because it is too nearly identical, one with the other, in all particulars, and in an affidavit in support of the motion for new trial the attorney for plaintiff in error stated that such testimony was concocted by Rosol and that these two witnesses perjured themselves at Rosol's suggestion.

Counsel for plaintiff in error first argue that error was committed by the trial judge with reference to his actions in the examination of witnesses during the hearing and by his statements and actions showing that he was prejudiced against plaintiff in error during the trial. The examination of some of the witnesses was long and tedious, some of them not understanding English very well, but we find nothing in the examination of any of these witnesses or in the

part that the trial judge took with reference to such examination or in his rulings on the evidence that would lead the jury to believe that he was prejudiced against plaintiff in error. It is true that he ruled repeatedly contrary to the contention of counsel for plaintiff in error, but it is also true that this counsel made frivolous objections, and at one time stated that he made the objection just because he wanted to object. If the judge, because of his actions in this regard, spoke sharply to him he was justified in so doing. We find nothing in the record that justifies the criticism of counsel for plaintiff in error as to the court's action in taking part in the examination being prejudicial to plaintiff in error, even if, as argued, such action be considered in the light of the reasoning of this court in *People* v. *Lurie,* 276 Ill. 630, and *O'Shea* v. *People,* 218 id. 352.

Counsel for plaintiff in error object to several instructions given on behalf of the State, among others instruction 10, on the ground that it did not confine the jury to the consideration of the evidence in the record. We do not think the instruction in question was misleading in this regard.

Counsel also object to instruction 11 given for the State, on the ground, as we understand it, that it would lead the jury to believe they had a right to disregard the testimony of any witness on all points if they believed such witness to have sworn falsely on any one of the material issues in the case, except in so far as such witness was corroborated by other competent evidence or circumstances in the case. There can be no question that even though a witness might swear falsely as to one material point in regard to other facts he might be corroborated by the testimony of other witnesses, and that in such case the jury might not be justified in discarding his whole testimony. (*Peak* v. *People,* 76 Ill. 289.) We do not think the wording of instruction 11 would tend to lead the jury to think otherwise.

Counsel for plaintiff in error also argue that the court erred in modifying instruction 13 offered on his behalf as to the jury being the judges of the credibility of the witnesses, by adding to the instruction as offered this provision: "You are the sole judges of the credibility of the witnesses in this case, and the credit to be given to each is to be determined by you from considering the probability or improbability of either statements, their means or want of means of knowledge of facts to which they testify, the opportunity of the several witnesses seeing or knowing the things about which they testify; and in passing upon any evidence in the case you have the right to take into consideration your own common knowledge and observation in the affairs of life." The wording of the modification which states that they had a right to take into consideration their "own common knowledge and observation in the affairs of life" is especially criticised, in that it might have been injurious in this case because the chief witnesses supporting the theory of the State were of Polish extraction while the plaintiff in error and most of the witnesses who testified for him were Italians, and that this wording might have led them to disregard the testimony of the Italians. We cannot see how it can be argued that this instruction could have that effect any more than it might have led the jury to disregard the testimony of the Polish witnesses. This court has more than once ruled that it was proper for the jury to be instructed that they had no right to disbelieve as jurors if from the evidence they believed as men. (*People v. Zajicek,* 233 Ill. 198, and cases cited; see, also, *Harris v. Shebek,* 151 Ill. 287, and *State v. Elsham,* 70 Iowa, 531.) This modification of the instruction merely stated that the jury ought to take into consideration, in considering the evidence, the same things that they would take into consideration in deciding upon the common affairs of life, and that they were to use their best judgment as reasonable men as they would in considering the common, every-

day affairs of life. There was no error in thus modifying the instruction in question. Indeed, counsel for plaintiff in error seem somewhat inconsistent in their argument on this question, because they argue that the trial court erred in refusing instruction 25 offered on behalf of plaintiff in error, which, in substance, practically asked the court to instruct the jury that they should be governed, in reaching a conclusion, by their common observation and experience concerning ordinary affairs.

Counsel for plaintiff in error further argue that the court erred in refusing to give their 27th instruction asked, which reads:

"The court instructs you that no juror should consent to a verdict which does not meet with the approval of his own judgment and conscience after due deliberation with his fellow-jurors and fully considering all the evidence in this case and the law as given in the instructions of the court."

The wording of the instruction as offered would tend to encourage a disagreement of the jury, and it has been more than once stated by this court that an instruction of that character should be refused. *People* v. *Lee*, 237 Ill. 272; *Addison* v. *People*, 193 id. 405.

Counsel for plaintiff in error further argue that the court erred in failing to give to the jury, on its own motion, an instruction as to manslaughter. The record shows that counsel for plaintiff in error during the trial stated to the court that in view of the defense made on his behalf plaintiff in error was guilty of either murder or nothing and that the defense wished no instruction nor form of verdict on manslaughter. The counsel who appear in this court did not represent plaintiff in error in the trial before the jury, and they now contend that notwithstanding the then counsel did not wish any instruction as to manslaughter, it was the duty of the court, on the record, to give such instruction to the jury. We cannot so hold. This court

has held that a court of review cannot reverse a judgment of conviction in a criminal case where, in looking backward over the trial, it might conclude that the accused's counsel had made some serious blunder; that the judgment will not be reversed for failure of plaintiff's counsel to exercise the greatest skill. *People* v. *Barnes,* 270 Ill. 574; see, also, *People* v. *Anderson,* 239 Ill. 168; *People* v. *Nall,* 242 id. 284; *People* v. *Thomas,* 272 id. 558.

Shortly after the verdict of the jury on February 13, 1918, the attorney for plaintiff in error who tried his case before the jury withdrew his appearance and one of the present counsel entered his appearance as substitute for the plaintiff in error and filed an affidavit in the trial court setting up reasons why the motion for a new trial should be continued in order to allow the substituted counsel time in which to prepare and present his reasons for the motion for new trial being allowed. This motion for an extension of time and continuance was denied and the court proceeded at once to hear and dispose of the motion for new trial. Most of the matters set up in the affidavit asking for a continuance were stated to be based upon the information and belief of the affiant, and particularly charged that the testimony of Marie Kujowski and Stanley Groszwicz was perjured and that their testimony had been procured by the efforts of John Rosol, the proprietor of the saloon. There can be no doubt that in furtherance of justice, when for any good reason the accused is justified in changing his counsel after the verdict of the jury, his new counsel should be given a reasonable time in which to prepare matters to be presented on motion for new trial, but delay is not required simply to give counsel an opportunity to scour the country to see if by any possibility something may not be found tending to disprove some matter given in evidence on the trial. Facts should be stated, in asking for a continuance to prepare for the hearing on the motion for new trial, showing necessity for delay, and that there is a substan-

tial reason, in the interest of justice, requiring it. In many cases a few hours' delay would be manifestly sufficient to enable counsel to prepare for making and arguing the motion for a new trial, while in other cases it is possible that by reason of peculiar circumstances it might require days. Without a clear abuse of the trial court's discretion in this regard, manifestly tending to an improper conviction, there should be no reversal on this ground. (*Bulliner* v. *People*, 95 Ill. 394.) The question is one which rests in the sound discretion of the trial judge, who is much more familiar with the record and the circumstances connected with the trial and what time is necessary to prepare and present the reasons than this court can possibly be. We cannot say that the trial judge abused his discretion in this regard in this case.

After the above motion was overruled on February 16, 1918, a motion was made February 23 to vacate the sentence, and this motion was supported by the affidavits of Ralph Zolfo, Louis Sinise and Michele Manduzio. These three affidavits in substance stated that affiants were well acquainted with plaintiff in error; that they also were well acquainted with another person named Rocco LeMorte, (the same name as that of plaintiff in error,) and that they saw this other Rocco LeMorte on Saturday night, July 14, in front of Rosol's saloon fire the shots at the crowd of Mexicans who were with Pina at the time he was shot; that plaintiff in error did not fire these shots and that they did not see him in the street with the crowd of Italians at the time of the shooting; that they had not said anything about this before because of fear of consequences to themselves if they so testified. It is most earnestly argued by counsel for plaintiff in error that the trial court erred in not allowing this motion, based on these affidavits, to set aside the judgment entered in the trial court and to allow a new trial. Applications for new trial on the ground of newly discovered evidence are not looked upon with favor

by the courts, "and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequence of an adverse verdict, such applications should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and that there has been no lack of due diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in a case of manifest abuse." (20 R. C. L. 289.) In *People* v. *Williams,* 242 Ill. 197, this court had occasion to consider what was necessary to be shown in order to justify a new trial on the ground of newly discovered evidence and stated that the evidence must be such as will probably change the result if a new trial is granted; that it must have been discovered since the trial and be such as could not have been discovered before the trial by the exercise of due diligence; that it must be material to the issues and must not be merely cumulative to the evidence offered on the trial. These same requirements are substantially set forth in Wharton's Criminal Pleading and Practice. (8th ed. sec. 866.) It has been frequently stated by this court that newly discovered evidence, on motion for new trial, must be clearly conclusive in its character to require the court to grant a new trial. (*Henry* v. *People,* 198 Ill. 162, and cases there cited.) Counsel for plaintiff in error, at the time of submitting these affidavits that a different person of the same name as plaintiff in error had fired the shots that killed Pina, did not file any affidavit that he had used due diligence or that the evidence was newly discovered as far as he was concerned, although in his affidavit for a continuance a few days before, he did in a general way state that he believed that he had ascertained that there were two persons named Rocco LeMorte living in Blue Island, not related to each other, and that one different from plaintiff in error was the one who fired

the fatal shots, and that he had used all diligence possible to ascertain the facts since he had been employed. There is nothing in the affidavits that states that the former attorney who tried the case before the jury had used diligence to ascertain this evidence or that he did not know of it at the time of the trial. The affidavits of these three witnesses are certainly, in some respects, extraordinary. All three of them swore that they had known the plaintiff in error for years. One of them said affiant had known him since he was a boy and had attended his wedding. Some of them apparently knew of his being bound over to the grand jury, indicted and tried for this offense. All of them, according to their affidavits, were present when the shooting occurred. It seems a very poor excuse for credible witnesses, under such circumstances, to keep silent until after their friend and acquaintance was convicted of the crime of murder because of the fear that they would be caused trouble by testifying publicly to what they knew. If they were present among the crowd at the dance and with the group of Italians, one of whom did this shooting, some of the people there must have known they were present, and by the exercise of reasonable diligence it seems manifest that someone must have talked with them as to what they knew about the circumstances. Under the circumstances here appearing on this record, these affidavits as to newly discovered evidence come obviously within the rule just quoted, that they should be subjected to the closest scrutiny in order that the court might not be misled by parties who might be attempting to practice fraud or imposition upon the court in order to escape the consequences of an adverse verdict. As already stated, a new trial will not be granted on account of the discovery of facts and circumstances merely cumulative in their character. The reason of the rule is that public policy, looking to the finality of trials, requires that parties be held to diligence in preparing their cases for trial. This rule, when properly applied, is a salutary guide to the

discretion of the court, and where the testimony is strictly cumulative and merely increases the weight of the evidence, leaving the cause still in doubt, or where it is of such a nature that its truth may be conceded without justifying acquittal in the face of other evidence, a new trial will not be granted. (20 R. C. L. 295, 296.) Courts are not required to believe an unreasonable story even though it is not contradicted, merely because it has been sworn to by a witness on the trial of the case. (*People* v. *Davis,* 269 Ill. 256; *Stephens* v. *Hoffman,* 275 id. 497.) This rule applies with equal, if not greater, force as to relying on and believing *ex parte* affidavits on a motion for new trial. We cannot say on this record that it was affirmatively shown that due diligence had been used by plaintiff in error or his counsel to ascertain whether such evidence existed before the trial, neither can we feel assured that if such evidence had been procured and presented to the jury a different result would have been reached by the jury.

It is also argued by counsel that the evidence does not justify the verdict; that the verdict is contrary to the weight of the evidence. Whether the evidence warranted the verdict was a question of fact peculiarly for the jury to determine, and great weight is to be given to their finding. Courts are reluctant to substitute their opinion for that of the jury upon controverted questions of fact, and it is only when this court is able to say, from a careful consideration of the whole of the testimony, that there is clearly a reasonable and well founded doubt of the guilt of the accused, that it will interfere on the ground that the evidence does not support the verdict. (*Steffy* v. *People,* 130 Ill. 98; *Lathrop* v. *People,* 197 id. 169.) We are unable to say from an examination of this record that the verdict in the case at bar is manifestly erroneous or that the finding of the jury is obviously contrary to the decided weight of the testimony.

The judgment of the criminal court will be affirmed.

*Judgment affirmed.*